UNITED STATES of America,
Plaintiff-Appellee,

v.

Vincent ALOI et al., Defen-
dants-Appellants.

Nos. 1144, 1150, 1159 and 1171, Dock-
ets 74–1220, 74–1278, 74–1614
and 74–1727.

United States Court of Appeals,
Second Circuit.

Argued June 24, 1974.

Decided Jan. 31, 1975.

Rehearing Denied July 7, 1975.

Kristin Booth Glen, New York City (Michael D. Ratner, New York City, of counsel), for defendant-appellant Aloi.

Gretchen White Oberman, New York City (Jay Goldberg, New York City, of counsel), for defendant-appellant Dioguardi.

Joel A. Brenner, Mineola (Gustave H. Newman, New York City, of counsel), for defendant-appellant Lombardo.

Gerald L. Shargel, New York City (La Rossa, Shargel & Fischetti, New York City, of counsel), for defendant-appellant Savino.

Bancroft Littlefield, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Alan R. Kaufman, T. Gorman Reilly, Peter I. Truebner, Daniel Beller, S. Andrew Schaffer, Asst. U. S. Attys., of counsel), for plaintiff-appellee.

Before MOORE and FEINBERG, Circuit Judges, and PALMIERI,* District Judge.

MOORE, Circuit Judge:

Vincent Aloi, John Dioguardi, Ralph Lombardo and John J. Savino were convicted under Count 1 of conspiracy to violate federal securities laws. 15 U.S.C. §§ 77q(a), 77s(a), 77x, 17 C.F.R. §§ 230.-256 and 240.10b–5, 18 U.S.C. §§ 371, 372. All four were also convicted under Count 18 of use of a false and misleading offering circular. Aloi (Count 10), and Dioguardi and Lombardo (Count 9) were convicted of wire fraud. All defendants appeal. For the reasons hereinafter stated, we affirm the convictions of Aloi, Dioguardi and Lombardo and reverse the convictions of Savino.

The various appellants raise so many points of alleged reversible error, the separate points of each being incorporated by reference by the others, that some initial general analysis and sifting of the facts must be made.

The main charge, Count 1, alleges a conspiracy, the object of which was unlawfully, wilfully and knowingly to offer and to sell to the public common stock of a company, At-Your-Service Leasing Corp. (AYSL), which was in a weak financial condition and consistently operated at a loss. The original purpose of the financing was to raise money for AYSL to enable it to pay off loans on which certain of the defendants who owned AYSL were personally obligated and to raise additional funds to carry on the business.

A conspiracy of this nature resembles a mosaic or a jig-saw puzzle. The picture consists of a myriad of individual pieces which when placed together reveal the ultimate image. Many artisans are frequently required, each contributing his segment. Despite the number of separate participants, it is one picture. And so here. An effort will be made sketchily to portray the part each appellant-conspirator and certain co-conspirators played.

At all relevant times, AYSL was an automobile leasing corporation doing business in West New York, New Jersey. Its owners and managers were defendants Sanford L. Price, Arthur Ferdinand, Murray A. Handler, J. Jack Ganek, and Edmund Graifer.[1] Defendants Andrew Nelson[2] and Gerald Miller[3] conducted business as Tech-Ec Systems (financial consultants). Miller was also an attorney.

In and subsequent to July, 1969, Nelson, a financial consultant (Tech-Ec) agreed with the principals of AYSL to arrange an AYSL stock issue for a $20,-000 fee. The issue was to be an unregistered exempt (Regulation A) issue of 100,000 shares at $3 a share, 50,000 shares of which had to be sold within 90 days of the SEC effective date, April 8, 1970, or the subscribed money refunded.

An offering circular was prepared by Nelson and Miller dated as of April 8, 1970. Apparently a broker-dealer, TDA Securities, Inc., whose principals were defendants Gilbert C. Dragani, Donald Fisher and Louis Nova,[4] was ostensibly

---

* Of the Southern District of New York, sitting by designation.

1. Price, Ferdinand, Handler and Ganek were also certified public accountants. They were indicted but their trial was severed.

2. Nelson was indicted and pleaded guilty.

3. Miller pleaded guilty.

4. Dragani, Fisher and Nova were indicted and pleaded guilty.

supposed to be the underwriter. The offering circular was most explicit. In bold type on the first page it stated: "THESE SHARES INVOLVE A HIGH DEGREE OF RISK." Under "Risk Factors to be Considered," were listed seventeen factors, any one of which should have deterred a prospective purchaser from buying the stock. And until the conspiracy commenced, no one did.

To summarize briefly, at this point there was an offering circular under which $300,000, less proper expenses, could potentially be obtained from the public. Graifer's and AYSL's financial conditions were such that they needed money by fair means or foul. Fair means having failed, they chose to investigate the possibilities of the other alternative.

There being no AYSL stock sales, Graifer as an owner and manager was called upon by his associates to remedy the situation. From this point on, the pieces of the mosaic began to be filled in rapidly. Graifer had a friend, Ralph Lombardo, and another friend in Florida, Sebastian Aloi,[5] father of Vincent Aloi.[6] Graifer and Lombardo went to Florida to consult with Sebastian. Sebastian instructed Lombardo to get in touch with a Michael Hellerman, a well-known stock swindler, to see if he could put the sale across. Hellerman was associated with defendant John Dioguardi, who owned a percentage of Hellerman's profits.

Thereafter, Lombardo, to whom Hellerman owed $10,000 on a loan, approached Hellerman, who agreed, after seeing the offering circular, to sell 50,000 shares provided he received a secret kickback of $45,000, "under the table", half of which, he said, had to be paid immediately in order to bribe brokers to tout the stock.

Lombardo and Hellerman then proceeded to Dioguardi's office to obtain Dioguardi's approval of Hellerman's participation therein, which was granted. Lombardo, Hellerman and Dioguardi then telephoned Sebastian in Florida and informed him of the terms. Thus, there was a guarantee by Sebastian of Graifer's performance and by Dioguardi of Hellerman's.

About the middle of June, because Graifer was unable or unwilling to pay the required $22,500, Lombardo produced and delivered $22,500 (half of the $45,000) to Dioguardi's office.[7] By July 7th, the expiry date for the sale of the 50,000 shares, Hellerman, despite his previous successes, had failed to cause the stock to be sold. Accordingly, Dioguardi returned the $22,500 to Lombardo.

Somewhat collateral to the stock sale but definitely related thereto was an incident which brought three additional defendants into the picture, Pasquale Fusco,[8] John Savino and Vincent Aloi, Sebastian's son. Hellerman in a previous unsuccessful stock deal had lost $10,000 belonging to Fusco and Savino. They were apparently without power to obtain its return without the aid of Dioguardi. Fusco and Savino were friends of Vincent and through an Aloi-Dioguardi arrangement, Hellerman was to pay the $10,000 when financially able to do it. When Fusco and Savino learned that Hellerman was going to receive $45,000 without making any provision to pay them, Fusco said that he would see Vincent to obtain his aid in getting their money back. This development temporarily halted any efforts to sell AYSL stock but Graifer, who was most seriously affected by the stoppage, again went to Florida, saw Sebastian and explained the difficulty. Sebastian told him not to worry, telephoned his son, Vincent, and although he spoke to Vincent in Italian, immediately thereafter told Graifer in English that everything would be straightened out and

---

5. Sebastian Aloi, originally indicted, was severed for health reasons prior to trial.

6. Because of the two Alois, first names will be used to identify them.

7. Details of delivery of $22,500 to a defendant Ira Schultz in an abortive attempt to induce him to try to sell the stock and the return of $22,000 thereof are omitted.

8. Fusco became ill during the trial and was severed.

that Hellerman and the stock deal would be reinstated. Hellerman was informed by Dioguardi that he could continue with his scheme but that Vincent had specified some variation in the former terms. Out of Hellerman's $45,000, Fusco and Savino were to receive $10,000, Hellerman was to repay Lombardo the $10,000 loan and Dioguardi was to receive the $25,000 balance.

Despite the passing of July 7th, the expiry date for the legal sale of the stock, money came in from sales effected by Hellerman and his henchmen, namely, brokers engaged by him.

On July 28, 1970, some three weeks after the legal expiry date, a purported "closing" under Hellerman's supervision took place. Present were Lombardo, Hellerman, Graifer, Ferdinand (a principal of AYSL), Nelson and Winter (Hellerman's attorney). Hellerman produced $150,000 in checks (50,000 shares at $3 a share), some bogus and some not honored. Hellerman arranged to have TDA backdate its records to July 7th to give an appearance of legality. Subsequently these checks to the extent of $127,500 became good.

In August 1970 Graifer, from the proceeds, delivered the $45,000 to Lombardo. Lombardo passed it on to Dioguardi. Dioguardi then gave $20,000 of this sum to Vincent who then distributed $10,000 to Fusco and Savino and $10,000 to Lombardo. The remaining $25,000 Dioguardi used to repay that amount on an indebtedness owed by him and Hellerman. This manner of this distribution was thereafter confirmed, each to the other, including Graifer.

Concerning activities after these events, it is sufficient to say that Hellerman, consistent with his reputed skill in this sort of activity, then conducted a series of spurious manipulations in the AYSL stock and reported them at least to Graifer and Lombardo.

Again to summarize, what had started as an effort to raise money for AYSL had been taken over by Hellerman, Lombardo, Vincent Aloi and Dioguardi as a scheme to obtain money from the public via the sale of AYSL stock for their own use and purpose without disclosure of this fact to the purchasers.

Before embarking on a more detailed analysis of the many points raised by appellants' counsel, some comment upon the trial must be made based upon an appellate perspective as obtained from the record. The trial lasted for over eight weeks. The transcript was almost 6000 pages, of which hundreds of pages were devoted to colloquy between court and counsel. The four appellants were represented by experienced defense lawyers whose seizure of every opportunity technical and otherwise on behalf of their clients in aid of their defense bespeaks the adequacy of their representation. Scores of motions for a mistrial are sprinkled throughout the record.

Fundamentally the case resolved itself into a question of witness credibility. The government's principal witnesses were Graifer and Hellerman. Their criminal records were well known. Following usual trial strategy technique, the government on its direct examination brought out much of their past records hoping to ameliorate, and soften if possible, the attack on cross-examination. Defense counsel thereafter devoted a high percentage of their time in establishing that these two witnesses, particularly Hellerman, had committed many crimes, in Hellerman's case stock swindles, check forgeries, tax evasion, frequent perjury, even ordinary stealing. Graifer, too, was "Graifer, the thief, the self-confessed perjurer." (Tr. 5066).

The government in turn introduced an agreement it had made with Hellerman under which he purportedly committed himself to tell the truth in exchange for many leniencies and financial benefits— of which more later.

Defense counsels' conception of the issues on the trial is best obtained from their own summations. To one defense counsel there was "no question of the fact that Mr. Hellerman and his cohorts perpetrated a swindle upon the public and cheated innocent victims." (Tr.

5066). To another there was "no dispute that there were criminal acts committed in connection with the stock fraud of At-Your-Service Leasing." (Tr. 5184). And all, during trial and summation, devoted a large portion of their efforts to demonstrating that Graifer and Hellerman were completely unworthy of belief. Belief or disbelief, being solely a jury function, the only law question is: was the jury given proper instructions for its determination? Factually, were appellants so tied into Hellerman's swindle as to constitute a conspiracy?

Corollary to the main issue of conspiracy are the questions of the conduct of the prosecution in establishing it and the sufficiency of the trial court's charge in outlining the factual issues to be determined by the jury.

The reviewing problem has not been rendered easier of solution by the government's brief. With little supporting proof the government assumes two groups, the Aloi and the Dioguardi, reminiscent of the Montagues and the Capulets, each group being charged with having entered into an agreement with the other to perpetrate the sale of worthless AYSL stock to the public (Gov't Br. p. 5). Its hyperbole in description is in many instances unsupported by the record or by any record references justifying its statements.

■ For this reason and because of the many appellate points raised by appellants' counsel, a detailed analysis of the entire record has been required. In so doing, it must be remembered that every departure from normal courtroom procedure does not constitute reversible error. And trial strategy should be left in the hands of counsel, who in this case ranked amongst the ablest of the criminal defense bar.

Probably no criminal charge is more difficult of definition than conspiracy. In short, there must be a conspiracy to commit a crime. Conspiracy itself has been defined as an agreement or a concert of action. Individuals, about to commit a crime, however, do not sit down and draft their agreement with the meticulousness of a corporate mortgage. Therefore, the conspiracy must most frequently be upon the facts and words of the alleged conspirators or the inferences drawn therefrom.

The conspiracy charged is that the defendants "did combine, conspire, confederate and agree together and with each other to commit certain violations of federal law, to wit, violations of Title 15, United States Code, Sections 77q(a), 77s(a), 77x and 17 C.F.R. §§ 230.256 and 240.10b–5." As "Objects of the Conspiracy", the indictment in substance alleged that as a part of the conspiracy the defendants would offer AYSL stock for sale, by means of communication in interstate commerce, employ schemes to defraud, obtain money by means of untrue statements and omissions of material facts and engage in practices which would operate as a fraud and deceit upon the purchasers of AYSL stock in violation of 15 U.S.C. § 77q(a). Also as parts of the conspiracy were alleged the use of a false and misleading offering circular (15 U.S.C. § 77s(a) and Rule 256(e), 17 C.F.R. § 230.256(e) and Form 1A, Schedule I), and the employment of manipulative devices in connection with the purchase and sale of AYSL stock (Rule 10b–5, 17 C.F.R. § 240.10b–5).

As "Means of the Conspiracy," the facts by which the defendants and co-conspirators would and did carry out the conspiracy and which are to some extent outlined herein, were set forth in the greatest detail.

We turn now to the principal errors asserted by the individual appellants.

*Lombardo:*

Lombardo challenges the sufficiency of the evidence to establish that he was a knowing member of a conspiracy to violate the securities laws of the United States.

■ A conspiracy to be criminal must, of necessity, encompass a crime. As the trial court charged, the jury could find a defendant guilty of conspiracy or aiding and abetting only if it were established that he knew of the unlawful purpose of

the conspiracy. There is more than sufficient proof in the record from which a jury could have found or inferred the following facts with respect to Lombardo.

■ Graifer and Lombardo were friends. When the desired sales of AYSL stock were apparently not capable of being made, Graifer turned to Lombardo for help. Lombardo knew of the hopeless financial condition of the company because Graifer had given him an offering circular disclosing it. Together they went to Florida to seek Sebastian's suggestions. Sebastian suggested Hellerman, who was represented as being "with" or in partnership with Dioguardi, and said that if Hellerman could do the deal Sebastian would contact Dioguardi. Upon their return to New York a meeting with Hellerman was arranged at which the offering circular was shown to Hellerman. Hellerman then regaled Lombardo and Graifer with his other stock swindles. Hellerman indicated that he could do the deal if Dioguardi approved but demanded $45,000 "under the table" for himself. He claimed that he needed 50% of this amount in advance ("up front") to bribe brokers to tout the stock. Lombardo also demanded from Graifer to be put on the AYSL payroll at $200 a week and free use of AYSL cars and credit cards.

Lombardo and Hellerman then proceeded to Dioguardi's office where, after a further discussion all three, Lombardo, Dioguardi and Hellerman, by telephone told Sebastian in Florida of their agreement.

It was Lombardo who delivered the $22,500 to Dioguardi, who in turn told Hellerman and Kelsey to give it to Schultz who was going to try to sell the stock. Schultz had no success and the money was returned, Lombardo being present at the time. Hellerman then told Lombardo that he could do the deal without the advance money.

A new deal was arranged for the distribution of the $45,000 which Vincent approved and which was known to Lombardo whereby Fusco and Savino were to receive $10,000, Lombardo $10,000 and Dioguardi $25,000, which Dioguardi applied on account of a debt.

At the purported closing held on July 28, 1970, at which funds represented by Hellerman as obtained from the sale of the stock in the amount of $127,500 were displayed, Lombardo was present.

Lombardo thus occupied a key role in Hellerman's swindle from the initial meeting down to the closing. He participated in most of the meetings with Dioguardi to promote the swindle and had a definite monetary stake therein, including his $200 a week from AYSL and other emoluments plus his $10,000, paid out of the $45,000. And Lombardo's telephone call to Sebastian was both in furtherance and in execution of the scheme in that Sebastian had to approve or confirm the deal. We conclude therefore that there was ample evidence to support Lombardo's conviction under Count 1.

■ Lombardo claims that Hellerman's testimony of a $10,000 loan by Lombardo to Hellerman at a highly usurious rate of interest was so prejudicial as to deprive him of a fair trial. A count (count 38) based upon this loan had been severed and Lombardo contends that no reference should have been made to it.

There is no question but that Lombardo received repayment in the amount of $10,000 out of the proceeds of Hellerman's swindle. To this extent testimony concerning the loan was admissible. Furthermore, its existence could have justified an inference that it might have been an influencing factor in Lombardo's participation in the conspiracy.

■ To refute the denial by Lombardo of the Hellerman loan the government introduced evidence of many other loans made by Lombardo to others. These loans were alleged to appear on certain lists in Lombardo's handwriting. Admission of these lists for cross-examination purposes may have been proper as an attack on credibility. Whether the government intended this restrictive pur-

pose or introduced the lists to prove Lombardo a loanshark is debatable. However, the court in its charge endeavored to confine the admission to a credibility issue.

■ Lombardo charges that the government sought to degrade him in the eyes of the jury by revealing his extramarital relationship with a young lady. However, this testimony was properly adduced in light of his presentation of himself as a family man.

■ Lombardo also claims that information obtained from his testimony given before a State Grand Jury in Nassau County as to which he was given immunity formed the basis for much of his cross-examination and that the use of these "Immunized Transactions" (Lombardo, Br. 49) deprived him of a fair trial. If, however, the information revealed was either already known or came from independent sources, this argument fails. The trial court investigated the facts in an evidentiary hearing and concluded that the prosecution had not made use of such testimony. There is no basis for holding the court's ruling to have been clearly erroneous.

*Dioguardi:*

All the appellants, particularly as stressed in Dioguardi's brief, attack the court's charge, claiming that it was inaccurate, inadequate, and insufficient. Because the jury's duty is to weigh the facts in light of the court's instructions as to the law, attention must be turned initially to the charge itself.

The court quite accurately, though briefly, outlined "the basic criminal enterprise that the government claims to have established." (Tr. 5487–5488). It started with Graifer's AYSL financial problems, continued through his "more or less legitimate means" to unload the corporation on the public, Graifer's subsequent meetings with Sebastian, Lombardo, Hellerman and Dioguardi, their placing the stock scheme in the hands of Hellerman and the accomplishment of the conspiracy by the unloading of the stock. In addition, the court gave a brief sketch of the respective roles which the government contended each defendant occupied, Dioguardi authorizing Hellerman to proceed and supervising his conduct, Vincent entering the conspiracy to take care of the Fusco-Savino claim against Hellerman, Savino to have his claim satisfied, and Lombardo, the original negotiator to "more or less run herd on the operation."

The jury was told briefly but adequately that the crime of conspiracy is "substantially as follows":

> If two or more persons, any two, conspire to commit any offense against the United States and one or more of such persons does any act to effect the object of the conspiracy, each shall be guilty of a crime. (Tr. 5490–91).

Three elements were stated: (1) conspiracy; (2) an object—namely, commission of an offense against the United States; and (3) an act to effect the unlawful objective. The court then proceeded by asking "What is a conspiracy" and answered the question by saying "A conspiracy in ordinary layman's language is no more or less than a common understanding entered into between two or more persons to achieve an unlawful objective." (Tr. 5490).

A "vice" of the court's charge, according to Dioguardi, lies in these words:

> " . . . I advise you as a matter of law that the objectives of this conspiracy as described by the government, namely, obtaining moneys from the public by fraudulently pumping worthless securities into the ordinary channels of commerce could not be accomplished without violating the above-mentioned statutes and you would be entitled to conclude that any defendant whom you find to have intended such objectives, must have contemplated the violation of those statutes." (Tr. 5492).

This was followed with the admonition that if a conspiracy were found that "all of them become guilty of any criminal act performed in the furtherance of that conspiracy, whether or not any of them

individually had anything to do with that particular unlawful act or even knew of its existence." (Tr. 5494).

This charge, argues Dioguardi, in effect constitutes an amendment of the indictment in that the jury could have found Dioguardi guilty if "he [Dioguardi] associated himself with Hellerman in an on-going scheme, beginning in 1969, to obtain money from the public in fraudulent security transactions, even though the grand jury did not frame the conspiracy count in this fashion." (Dioguardi Br. 33).

■ This argument is tied in with, and dependent upon, his claim of error in the admission of proof that beginning in 1969 Dioguardi had 25% (raised to 50% in the *Belmont* [a previous Hellerman stock swindle] stock fraud) of everything Hellerman did and of proof to a limited extent of the *Belmont* deal. Dioguardi's claim that the injection of Hellerman's *Imperial* and *Belmont* frauds into the case thereby allegedly forced him to defend himself in three separate trials is not well founded. None of the issues in those cases was before the jury here. And despite protracted colloquy between court and counsel as to whether the outcome of those cases should be presented to the jury, it was not.

The trial court's charge, according to Dioguardi, did not accurately define the offenses (Counts 1 and 18) and their respective elements. His criticism is that the court did not read the applicable statutes to the jury but merely stated that if they found certain facts then the crime charged had been committed as a matter of law, citing Morris v. United States, 156 F.2d 525 (9th Cir. 1946), and United States v. Levy, 153 F.2d 995 (3rd Cir. 1946). In particular, Dioguardi claims that the court should have defined the terms "fraudulent", "material" and "undisclosed underwriter" and should have charged that any material omissions from the offering circular had to be willful.

Criticism is also levelled at the brevity of the court's charge. This was a long trial; the jury had heard and seen many witnesses. At the conclusion of the trial they must have had a fairly good idea as to the issues. The summations of the four counsel for the four defendants and the government highlighted the salient contentions. The value to a jury of a four or five hour charge will undoubtedly be a subject for judicial debate for years to come. The so-called "boiler plate" section of the charge has been built up over the generations to a highly disproportionate size by adding the omissions held to have been error by appellate courts in their decisions over the years. An attempt at brevity is now characterized as "plain error"—a term of art tantamount to saying that a defendant has not had a fair trial.

■ If error is "plain" one might well ask: plain to whom? Apparently not to the experienced defense counsel during the trial. These counsel were given by the court a copy of its charge in another similar case and advised by the court that it proposed to give a somewhat similar charge as to the substantive counts. Rule 30, F.R.Cr.P. must be given some meaning. Its purpose is obvious, namely, to give the trial judge an opportunity to remedy any defects which counsel believe may exist.

Dioguardi claims error as to him in the introduction of an alleged partnership agreement with Hellerman whereby he was entitled to a certain percentage of Hellerman's profits obtained through his swindles. Such proof did not constitute a variance from the indictment or introduce prejudicial evidence of other unrelated crimes. The relationship with Hellerman and Dioguardi had to be developed to show Dioguardi's place in the AYSL stock fraud. Witness: Graifer's question to Sebastian when Hellerman's name was mentioned as to how and why Dioguardi was involved. (Tr. 477). The evidence, as well outlined in Dioguardi's brief, discloses a close relationship to the AYSL swindle from the initial time when Hellerman said he had to consult Dioguardi before he could proceed with the deal through the various meetings at his office, his various telephone calls to

Sebastian and his interest in keeping his hands on the pursestrings of $45,000 of the proceeds.

*Aloi:*

██ Aloi (Vincent) would have his participation limited to an effort to help his friends, Fusco and Savino, obtain payment of the alleged indebtedness of Hellerman to them. However, the proof and the reasonable inferences therefrom lend themselves to factual conclusions quite beyond any such restricted purpose and activity. When Vincent was informed that Fusco and Savino had not been provided for out of Hellerman's $45,000, he must have known the details as to its proposed source and must have communicated with Lombardo on the subject. He was a definite participant through orders to Lombardo to obtain the return of the $22,500 (half of the $45,000) given to Hellerman.

The telephone call from Sebastian in Florida to Vincent in Suffern, N.Y. is not without significance, and from the consequences thereof the jury would have been justified in believing that the subject matter of the conversation was not limited to the merits of Florida weather. Graifer had gone to Florida to complain about the interruption of the stock deal purportedly by Fusco and Savino. Sebastian, although speaking in Italian to Vincent, at the conclusion of the call said in English "everything will be straightened out"—and indeed it was. Hellerman was reinstated but the terms of the $45,000 payment were altered. The terms (there was testimony that Dioguardi told Hellerman that he could proceed on new terms set by Vincent) called for a distribution at the end of the deal by Vincent and Dioguardi who would pay $10,000 to Fusco and Savino; and $10,000 to Lombardo. The remaining $25,000 Dioguardi used in payment of an unrelated indebtedness.

Vincent was obviously interested in the outcome of the stock sale ("He just wanted to know what was going on." Tr. 1860) He knew that the stock issue was to be the source of the money with which the conspirators were dealing and

when he heard that Hellerman had actually sold more than 50,000 shares of AYSL stock said that he would take the matter up with Dioguardi. Vincent's argument that the proof shows (at the "very worst") only that he "knew that some kind of stock swindle was going on," ignores the many facts establishing that he participated in keeping the swindle going and that through his hands passed much of the proceeds thereof.

At the July 28, 1970 closing Lombardo was there "to report back to Vinny (Aloi) how everything was going." At the closing Hellerman was told by Lombardo to get in touch with Dioguardi and that Vincent and Dioguardi would "straighten out the money" (Tr. 1864). When the money became available Graifer received $45,000 which he delivered to Lombardo, who in turn delivered it to Vincent for the distribution above described. Each of the beneficiaries on various occasions thereafter acknowledged their benefactions to one or more of the other defendants.

Conversations concerning the stock deal between Vincent, Lombardo and Graifer continued through 1970 and into early 1971.

Vincent's present contention that there were multiple conspiracies and that his only participation in the events related to an endeavor to retrieve $10,000 for his friends is belied by the evidence.

██ Vincent claims that he was unconstitutionally prevented from taking the stand because the trial judge had ruled in advance that a state court perjury conviction (then on appeal) could be used to impeach him. (Whether he would have taken the stand is conjectural. No offer of proof was submitted by his counsel.)

Apparently the circuits are in conflict on the impeachment use of a non-final (namely, still on appeal) conviction. This circuit has recently considered the question in United States v. Soles, 482 F.2d 105 (2d Cir.), cert. denied, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973), in which Judge Friendly analyzed the mer-

its of the conflicting views. In both *Soles* and this case the previous conviction was closely related to credibility (in *Soles,* bribery; here perjury). We, therefore, continue to adhere to the rule that the trial judge has discretion to allow the use for impeachment purposes of a conviction under appeal and for the reasons stated in *Soles.*

Vincent also claims that the indictment was unlawfully amended by the addition of some twenty alleged co-conspirators on the eve of the trial. Such a practice is not to be commended but on appellate review the question is: how were the defendants prejudiced thereby? Of the added co-conspirators only Shustek's conversations bore upon the issues, and these were merely cumulative.

*Savino:*

No facts whatsoever were presented by the government sufficient to establish that Savino was a member of the conspiracy alleged in the indictment. The far-fetched and unjustifiable inferences sought to be drawn by the government in an effort to tie him into the conspiracy attest to the lack of any foundation upon which to rest his conviction. The facts surrounding Savino's involvement are clear.

Prior to the conception of the AYSL stock offering and as a result of a $10,000 loss sustained by Savino and Fusco on stock of a previous Hellerman venture (Trimatric), Hellerman had agreed to repay this amount to them when financially able to do so. There is no basis for the government's inference that Savino must have known that Trimatric was a Hellerman swindle nor was there any proof that it was. Whatever may be the reasons for Hellerman's admission of this obligation, they are irrelevant to the conspiracy here charged.

When Savino and Fusco fortuitously learned that Hellerman might be in funds (the $45,000 from the AYSL deal) they were naturally desirous of receiving the $10,000 repayment promised when Hellerman's financial condition permit-

ted. Their knowledge of how best to apply pressure is evidenced by their turning to Vincent for his help in obtaining repayment. And it may very well be that Vincent insisted as a condition of Hellerman's proceeding with his planned stock swindle that Fusco and Savino be paid Hellerman's indebtedness to them.

To obtain a commitment for payment from Hellerman, Vincent may have temporarily stopped the AYSL deal, but this act did not inject Savino into the conspiracy. The government makes a wholly unjustified assumption that if Savino knew or suspected that Hellerman was engaging in another of his many stock swindles that fact automatically made Savino a conspiratorial participant therein. Nor does the fact that the $10,000 was paid to Savino and Fusco out of Hellerman's ill-gotten gains place him in such a category.

The government argues that Savino knew or must have known that Hellerman's AYSL stock deal was a fraud and that "he had access to the man who ultimately stopped it and started it again, Vincent Aloi." (Gov't Br. 40). Only with restraint can this argument be characterized as a *non sequitur.*

In summary, there is no proof that Savino was a participant in any way in Hellerman's stock fraud set forth in the indictment and in the operations employed in its accomplishment. Whether he induced Vincent to aid him in the recovery of the Hellerman debt is no part of, or relevant to, Count 1 of the indictment.

Since Savino was never a member of the unlawful conspiracy alleged in Count 1, we must also reverse his conviction under the substantive Count 18. United States v. Cantone, 426 F.2d 902 (2d Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970).

*The Government-Hellerman Agreement:*

Dioguardi and his co-appellants strongly attack an agreement made by the government with Hellerman to induce him to testify. As Dioguardi's counsel quite accurately states: "The ex-

tent of the consideration given to Michael Hellerman to induce him to testify was extraordinary." (Dio. Br. p. 55)—and indeed it was. He had swindled the public out of millions of dollars; he had failed to pay income taxes; he had promised as a condition of leniency to refrain from further criminal activities, which promise he broke. Even when pretending to be in the government camp he was surreptitiously engaging in further swindles, brazenly admitting that "I thought I could get away with giving information to the government and making money on the side." (Tr. 2377).

But the government was apparently willing to forego further prosecutions and collections of large amounts of income tax to secure his testimony.

Counsel for Dioguardi argues that "any witness who takes the stand is obligated, by virtue of the oath he takes, to testify truthfully," and that as a result "no special agreement with him was necessary to secure truthful testimony." Therefore, he contends that it was highly improper for the government to argue in summation that the government's agreement with Hellerman put the imprimatur of truth upon his testimony. The government even sought to reinforce Hellerman's questionable credibility by disclosing its threat, under the terms of the agreement, to prosecute him for perjury if he testified falsely.

However, whether this incident deprived appellants of a fair trial must be considered in light of all the circumstances. The jury had seen and heard Graifer and Hellerman. They had heard appellants' counsel day after day blast their capacity for veracity. The agreement was merely one of many items to bear upon the question. It is to be doubted that an agreement could override the effect of the many unconscionable crimes which counsel paraded before the jury as perpetrated by these witnesses. Furthermore, the question of credibility was properly presented to the jury by the court.

*Joint Trial With Dioguardi:*

Vincent and Lombardo claim denial of due process because of prejudice resulting from being tried with Dioguardi. This prejudice could have been avoided, they claim, by the granting of a severance. In short, these defendants assert that Dioguardi's reputation as an underworld figure and the introduction during the trial of his extensive criminal record, his continuing arrangement with Hellerman, and his associations with various other notorious persons contaminated them because of trial joinder.

During the jury *voir dire,* which required three days, the trial court allowed the defense twenty peremptory challenges and the prosecution twelve. Vincent takes exception to the court's ruling that the peremptory challenges had to be exercised unanimously rather than by allotment of separate challenges. However, prior to the use of these challenges, many jurors had been excused for cause. A jury of twelve with six alternates was finally selected. But even thereafter the trial judge personally interviewed each juror and alternate as to prejudice. Quite naturally in any multi-defendant trial there will be differences in degree of guilt and possibly degree of notoriety of the defendants. There may be some likelihood that proof admitted as to one or more defendants will be harmful to the others. However, this possibility does not necessarily justify individual trials. Faced with this situation the trial judge took every feasible step to obtain an unbiased jury.

During the trial Dioguardi and Lombardo elected to take the stand. Under such circumstances the government was entitled to inquire into their past criminal activities. Vincent, despite his protestation that "[he] and Savino played minor if not negligible roles" (Aloi Br. p. 47), took an important part in the conspiracy, particularly in the disposition of the proceeds of the fraud.

Finally as to prejudice resulting from the joint trial Vincent asserts that the charge "was totally inadequate to

deal with any, let alone all, of the prejudicial testimony allowed into the trial." (Aloi Br. p. 53). Of course the trial judge could have consumed hours in analyzing every bit of evidence which applied only to a particular defendant, but the conclusion would not have been different from the charge as given, namely, "evidence offered or admitted only (sic) one defendant should not be considered in connection with your determination of the guilt or innocence of any other defendant." (Tr. 5479).

■ Considering the nature of the case and the roles which each defendant played, severance was properly denied.

*The Wire Fraud Counts:*

■ Lombardo and Dioguardi attack their convictions under Count 9 on the ground that the telephone call to Sebastian was not made for the purpose of "executing" (18 U.S.C. § 1343) the stock swindle scheme but at most was "for the purpose of concocting a conspiracy" or "for the purpose of formulating a conspiracy to defraud", purposes allegedly not proscribed by the statute. There was adequate proof to rebut any assumption that the conspiracy was created or concocted in this telephone call. To the contrary the scheme had been formulated and was already in existence. Sebastian's approval, to the conspirators at least, was a required part of the scheme. The call was definitely in furtherance of the conspiracy.

■ Vincent's conviction under Count 10 was based upon the telephone conversation with Sebastian in June 1970. Vincent claims that the judge's charge was reversibly erroneous because he charged that any defendant "already found guilty of conspiracy" could be found guilty if the call were made "in furtherance of the unlawful scheme to defraud alleged in the indictment," (Vincent's Br. 37). This use of the words "in furtherance" instead of "in execution of" constitutes, so argues Vincent, a fatal variance. Such an argument is quite unrealistic. A single call concerning the scheme might well be an important in-

gredient thereof without it being the complete execution thereof. In this instance, despite the Vincent-Sebastian conversation being in Italian, the purpose of Graifer's visit to Sebastian, his conversation in English as to the problems facing the stock scheme and Sebastian's statements to Graifer in English justify the inference and a jury conclusion that the use of the telephone wire was in connection with, in furtherance of and thus, in execution of, the conspiracy.

*Count 18—Use of a False and Misleading Offering Circular:*

The indictment alleged that the defendants "willfully used and caused to be used" a false offering circular. Vincent argues that there were no material misrepresentations in the offering circular and in any event that there was no "use" of any offering circular so far as he was concerned. He points to the fact that the circular had been filed with the SEC and become effective on April 8, 1970, and that he did not enter the conspiracy (a conspiracy is not conceded by him) until the June 1970 Florida telephone call from Sebastian. Therefore, Vincent concludes that he cannot be found guilty of committing the substantive crime (Count 18) which took place prior to his alleged entry therein. United States v. Cantone, *supra,* 426 F.2d at 904.

■ As to the argument that there was a variance between indictment and proof in that "the offering circular was never 'used' in any common sense of the term" (Aloi Br. 27), Vincent would restrict the word "use" to the delivery thereof to a purchaser or prospective purchaser prior to the sale. There is no sound basis for any such limitation. The proposed offering circular had to be filed with the SEC. On the basis of the representations therein the Reg. A exemption requested would or would not be granted. Once granted, no securities could be sold unless the circular were furnished to the prospective purchaser at least 48 hours prior to the mailing of the confirmation. To be sure, the offering

circular was not used in the manner normally to be expected, namely, mailed to prospective purchasers before sales were consummated.[9] But having been filed with the SEC, it was the genesis of the subsequent plan to defraud, and, facially at least, the existence of the filed circular lent an aura of legitimacy to the scheme.

■ Whether the offering circular contained any false or misleading statements or any material omissions at the time of its original filing need not be resolved because when the Hellerman plan was conceived and carried out, i. e., when the circular was "used" and after Vincent had joined the conspiracy, it certainly became false. 17 C.F.R. § 230.-256(e) provides: "In no event shall an offering circular be used which is false or misleading in light of the circumstances then existing." The circumstances then existing bore no relationship whatever to the circumstances existing on April 8, 1970.

The subsequent Hellerman role had not been disclosed, the appropriation of $45,000 to their own use by the conspirators was not revealed, and the "use of proceeds" representation had been rendered completely false. Hellerman and Lombardo knew, from having had the circular in their hands, that their planned nefarious scheme was not set forth therein. Dioguardi knew of the fraudulent selling scheme because Hellerman had told him of his plan.[10]

Dioguardi, Lombardo and Vincent put themselves in Hellerman's hands, as their agent, their co-conspirator or their abettor (terminology in this situation is not of the essence) to accomplish a fraud. The method used by Hellerman may have been of little interest to them, the beneficiaries, but they cannot claim to have been mere spectators watching the game from the sidelines. The proof shows that all three had their glasses trained upon the game which Hellerman was playing and that they were intensely observing, and interested in, every move.

■ The proof was more than adequate to justify the conclusion of a conspiracy. Nor can the conspirators escape responsibility for the acts of their co-conspirator. They chose to give Hellerman *carte blanche* to conceive, manage and carry out their fraud. Under the doctrine of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), they are liable for substantive crimes committed in furtherance of the conspiracy.

That innocent people were injured by the defendants' stock swindle was a point little stressed at the trial. The prosecution was so obsessed by its two-family (Aloi-Dioguardi) hierarchical theory and its concentration of proof on the machinations relating to the division of the stock swindle proceeds, that the source of the funds to be realized from the swindle played a minor part in its presentation. However, we think the victims of the plan are worthy of mention. Five witnesses were produced who testified that at the behest of Heller-

9. The government states in its Brief that "the offering circulars were 'used' as well, in other ways than being mailed to purchasers," and that "There was clear circumstantial evidence that the offering circulars were sent to purchasers of AYSL stock." The statements are followed by the declaration that "at the time Hellerman mailed the offering circulars to purchasers of the stock he knew that the circular was false . . .." (Gov't Br. 51). There is no proof in the record that Hellerman mailed or caused to be mailed an offering circular to any purchaser. Unable to supply proof or record references for these unfounded assertions, the government lamely retreats to the position that "it follows that the jury could have reasonably inferred that Hel-

lerman sent (or gave) the offering circulars to his purchasers . . .." (Gov't Br. 52). However, even this unwarranted assumption is undercut by the actual proof that the circulars were delivered to Nelson, who did not mail them but delivered them to Hellerman, who in turn failed to mail them. Only certain confirmations were mailed and received by purchasers.

10. Hellerman explained that he would sell the AYSL stock, first by bribing brokers, and then by having buy and sell confirmations made up showing a two-point spread to convince people to buy on the basis that they had a sure profit in the stock. Tr. 1804–06.

man's broker-salesmen they had purchased and paid for the worthless AYSL stock. They paid by checks, which were produced along with the confirmations they had received by mail. Since it may reasonably be assumed that none of the conspirators was coming to the rescue of AYSL out of their own pockets, it would be an equally reasonable inference that the $127,500 came from illegal sales to innocent and defrauded purchasers.

*The Sentences Imposed:*

 Vincent and Lombardo contend that their sentences were improperly imposed. Vincent was sentenced to five years on the conspiracy count (Count 1) plus a $10,000 fine, to four years (consecutive) on the false circular count (Count 18) plus a $5,000 fine, and a five-year suspended sentence plus a $1,000 fine on the wire fraud count (Count 10)—a total of nine years and fine of $16,000. Lombardo was sentenced to concurrent terms of five years on Counts 1 and 18 and a suspended five years on Count 9. He, too, was fined a total amount of $16,000. These appellants claim that hearsay material contained in the probation report and in a special sentencing memorandum submitted by the government at the request of the trial judge may have caused the judge to sentence them for offenses *other* than those for which they were convicted.

This court recently considered the question of a government sentencing memorandum in United States v. Rosner, 485 F.2d 1213 (2d Cir., 1973), cert. denied, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). The factual situation was somewhat different there in that the government submitted the memorandum *ex parte* to the court which kept it for some two months. Only on the day of sentencing was it disclosed. The court then denied a requested opportunity to study and rebut, if possible, the contents. Under the "unusual circumstances" (485 F.2d at 1231) of the *Rosner* case, this court remanded for sentencing before another judge. Here, however, the memorandum was put into the hands of defense counsel a

week prior to sentencing. Forty-one pages of colloquy were devoted by counsel to exploring and answering the allegations therein (A. 132–173). Analysis of this colloquy reveals that defense counsel were aware of the bases for the government's recommendations and forcefully pointed out the hearsay and asserted irrelevant nature thereof.

In the Seventh Circuit case of United States v. Solomon, 422 F.2d 1110 (7th Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970), the court was faced with the problem of the effect upon the mind of the sentencing judge of a confidential report on the defendant prepared by the prosecutor in connection with a proceeding for revocation of bail for the trial court's inspection *in camera.* Although the court under the particular facts of that case felt that resentencing was not required, it said:

> Hereafter in this Circuit, however, a trial court shall not consider *in camera,* a prosecutor's report about a defendant prior to sentencing or ruling on post-conviction motions unless the pertinent factual information is summarized for or disclosed to defense counsel with appropriate safeguards.

*Id.* at 1121 (emphasis in original).

Somewhat similar situations have been considered by the courts where there has been non-disclosure by the sentencing judge of presentence reports or other information regarding a defendant from prosecutor to court. If disclosure of a presentence report under appropriate circumstances be important, how much more so is the disclosure of a memorandum prepared by the prosecutor containing not only accusations of other crimes but also his own opinion as to the sentences. See generally the discussion of the subject in *Rosner, supra*; United States v. Brown, 470 F.2d 285 (2d Cir. 1972); United States v. Malcolm, 432 F.2d 809 (2d Cir. 1970); Haller v. Robbins, 409 F.2d 857 (1st Cir. 1969); United States v. Fischer, 381 F.2d 509 (2d Cir. 1967), cert. denied, 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968). Although a document such as this prosecutor's

memorandum may not be utilized by the judge *in camera,* here there was full disclosure and an equally full opportunity to rebut.

The court's sentences here were within the permissible sentences for the crimes charged and we find no reversible error in the sentencing procedure.

*Electronic Surveillance:*

■ Pursuant to an order of the trial court dated November 21, 1973, the United States Attorney for the Southern District of New York by letter dated November 29, 1973, specifically inquired of the Assistant Attorney General, Criminal Division, as to any conversations overheard or intercepted by electronic surveillance in which the defendants Vincent, Dioguardi, Lombardo, Savino or Fusco were parties. The reply was negative except as to an October 2, 1964, conversation monitored by the FBI at which Dioguardi was present. Further inquiry revealed nothing thereafter. The Department of Justice in its search covered the Internal Revenue Service, the United States Postal Service, the United States Secret Service, the Bureau of Alcohol, Tobacco and Firearms, the Drug Enforcement Administration, the Bureau of Customs, the Central Intelligence Agency, the United States Department of Labor, the United States Department of Defense and the United States Department of State.

The trial judge was duly notified of the negative results of the requested inquiry. Copies of the correspondence between the United States Attorney, the Department of Justice and the trial judge were sent to all appellate counsel. We find that this inquiry constitutes full compliance with the trial court's order and with the principles enumerated in United States v. Smilow, 472 F.2d 1193 (2d Cir. 1973).

*Other Allegedly Prejudicial or Irrelevant Testimony:*

■ Appellants contend that the prosecution intentionally introduced inflammatory testimony with no object other than to prejudice the jury against the defendants. The use of nicknames was brought out, e. g., Charles San Filippo, as "Charlie Lamb Chops", Vincent as "Big Vinny", Philip Yovanovich as "Philly Rags", Fusco as "Checko Brown". The fraudulent broker, Gary Fredericks, was identified as a brother-in-law of Sonny Franchese, a rather publicized criminal. References were also made to Jimmy Hoffa and the Teamsters Union. Although this prosecution practice is to be condemned, the expressions, whether they be nicknames or underworld words of art (e. g., "sit-down", "with", "honorable man", "audience" and "hangout") will not be presumed to have had such contaminating significance in the minds of the jurors as to have deprived the defendants of a fair trial. Both prosecution and defense counsel were dealing with defendants and witnesses who in many instances had been steeped in crime. For their respective advantages counsel did not minimize this fact. The witnesses frequently resorted to their own jargon. Our task is to try to estimate its effect on the jury in light of a resolution of the "fair trial" question. Of necessity this appraisal must be made on the basis of its effect upon this court. Against the background of an eight weeks' trial with scenes frequently emotional, we do not believe that these epithets occasionally interspersed throughout the testimony materially diverted the attention of the jury away from their task.

*Conclusion:*

In final analysis the question to be answered, after a review of the indictment, the appendix, the transcript and the voluminous briefs of all four appellants, is: have they had a fair trial? The indictment put them on notice as to the charges against them. For eight weeks appellants concentrated upon the lack of credibility on the part of their accusers. They did not seriously question Hellerman's stock swindle—only their connection therewith. The court's charge, although it could have defined and stressed the elements of the crimes

603

charged in the various counts with greater specificity, adequately presented the factual issues for jury determination. For these reasons we affirm the judgments of conviction as to appellants Lombardo, Dioguardi and Vincent Aloi and reverse as to appellant Savino.

ON PETITION FOR REHEARING

PER CURIAM:

Appellants Vincent Aloi and Ralph Lombardo have urged in a petition for rehearing that the failure to charge willfulness as to Count 18 was not waived and was plain error under the law of this circuit, citing, e. g., *United States* v. *Howard*, 506 F.2d 1131 (2d Cir. 1974), and *United States* v. *Fields*, 466 F.2d 119 (2d Cir. 1972). However, in view of Judge Knapp's charge to the jury, applying the principles of *Pinkerton* v. *United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and in view of the broad definition of "use" we have earlier approved, 511 F.2d at 599–600, we do not agree that there was plain error.

The petition for rehearing is denied.