**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Terrence CREAMER, Defendant-Appellant.**

**No. 76–1480.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1977.

Decided March 29, 1977.*

Rehearing and Rehearing En Banc Denied May 16, 1977.

* This appeal was originally decided by unreported order on March 29, 1977. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., John L. Sullivan, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and TONE, Circuit Judges.

CUMMINGS, Circuit Judge.

In December 1975, the defendant, Terrence Creamer, a Chicago police officer, was indicted along with Waroon Netisingha and Lee Martin on one count of conspiracy to distribute heroin in violation of 21 U.S.C. § 846, and three substantive counts of heroin distribution in violation of 21 U.S.C. § 841(a)(1). Both Netisingha and Martin entered guilty pleas prior to Creamer's trial, but only Martin offered testimony at the trial.[1] After a three-day trial beginning on March 30, 1976, the jury found defendant guilty on all four counts and Creamer received 15-year concurrent sentences on each count. This appeal ensued. We affirm.

*Attacks on Evidence as Insufficient in Law*

Defendant argues that the evidence was insufficient as a matter of law to support the charges in the indictment.[2] Creamer first maintains that there was a fatal variance between the indictment as supplemented by the Government's answers to his bill of particulars. The three substantive counts alleged distribution to named agents while the proof, as the Government concedes, demonstrated that Creamer had distributed heroin only to Martin.

Historically, the "fatal variance" doctrine arose in order to provide a defendant with notice of the charges against him so that he could intelligently marshall his defense and to protect him against a subsequent prosecution for the same offense. *United States v. Cassell*, 452 F.2d 533, 536 (7th Cir. 1971). Creamer's reliance on *United States v. Raysor*, 294 F.2d 563 (3d Cir. 1961) is misplaced. In *Raysor*, a two-count substantive indictment alleged a narcotics sale to one Dillworth, a federal narcotics agent, although the evidence showed the actual sale was to one Charity, a narcotics addict informer employed by the federal narcotics officer. This "manifestly sloppy" indictment technically did not prevent a subsequent prosecution of the sale to Charity and did not fully apprise the defendants of the charges against them. Here the indictment adequately notified Creamer that the Government would proceed against him on a joint-venture basis. Count I of the indictment, the conspiracy count, explicitly incorporated substantive Counts II–IV as overt acts in furtherance of the conspir-

---

1. Martin pleaded guilty to the charges in the instant indictment and to those in another heroin indictment, *United States v. Scala and Martin*, 76 CR 318, before Judge Kirkland. He had also violated a five-year probation received from Judge Lynch for his pleas of guilty to theft from interstate shipment. There was an agreement that he was to receive a sentence of six years on both of the indictments. In sum, if the plea agreement evaporated, Martin would have faced a possible maximum sentence of 105 years and a $105,000 fine.

2. Although we choose to address the sub-branches of defendant's arguments *seriatim*, we are not unmindful of their cumulative effect. *Kotteakos v. United States*, 328 U.S. 750, 763–765, 66 S.Ct. 1239, 90 L.Ed. 1557. We find no *gestalt* that needs to be addressed independently of the individual error assertions.

acy. Moreover, the Government's answer to defendant's bill of particulars query on who distributed the heroin in Counts II–IV correctly recited that "[u]nder the principles of law, all three defendants distributed the heroin." *United States v. Schennault*, 429 F.2d 852, 854 (7th Cir. 1970). Thus defendant received fair notice of the charges against him and faced no double jeopardy risk.

■ Defendant next challenges the sufficiency of the evidence adduced to support a conspiracy/joint-venturer theory. Taking Martin's testimony as true, defendant argues that Martin was an independent contractor, purchasing drugs from Creamer and disposing of them totally as he pleased without any regard for a joint objective. A simple buyer/seller relationship cannot be transformed into a conspiracy solely on the basis of one transaction. *United States v. Braico*, 422 F.2d 543, 544 (7th Cir. 1970), certiorari denied, 398 U.S. 912, 90 S.Ct. 1712, 26 L.Ed.2d 74. Of course, this conclusion results theoretically from the premise that no agreement to achieve ends beyond the one transaction can be inferred from an isolated sale. But even if Martin and Creamer were buyer and seller, if sufficient evidence exists to prove a concert of action, a conspiracy will have been made out as a matter of law. *United States v. Varelli*, 407 F.2d 735, 748 (7th Cir. 1969).

■ Taking the testimony in the light most favorable to the Government, as we must, Martin's testimony along with the corroborative surveillance evidence of virtually all the meetings between this case's cast of characters amply supports the verdict that Creamer, Netisingha and Martin conspired to distribute heroin as joint-venturers. Martin's testimony details a $500 sale of a quarter ounce between Martin and Creamer on November 4, 1975. Part of this heroin lot was cut and sold to an Illinois Bureau of Investigation Special Agent, Robert Johnson, working undercover for the Federal Drug Enforcement Administration. Martin told Johnson and DEA Agent Robert Fanter that his heroin had come from a "Chicago copper [Creamer]."

The agents expressed interest in buying two ounces of heroin from "the cop" and Martin said he would try to arrange it. On November 6, 1975, Martin called Agent Johnson, telling him that Martin had met with "the cop" and that Creamer's $2,000 an ounce price was firm. On November 7, 1975, arrangements were completed and the initial part of the deal was transacted in a parking lot in Chicago. The agents displayed the $4,000 agreed amount to Martin, and he left to check with "Terry" [Creamer] how the deal was to transpire. Martin met with Creamer who suggested a method of exchange of the heroin for the cash. Martin returned to the agents who rejected the plan because it required them to "front" the money. Martin returned to Creamer to ask for modified instructions, and two more plans of exchange, which Martin represented as being put forward by "the cop" or by "Terry," were successively offered to and rejected by the agents. The fourth plan was acceptable since Martin left his son with the agents as security for their cash. Martin gave the cash to Netisingha in Creamer's presence, received the heroin and delivered it to the agents.

Creamer also met with Martin on November 14, two days after the agents had asked Martin for more heroin. The agents met with Martin at Bubba's Tavern where Creamer called and told Martin to go to a YMCA. Creamer appeared at the YMCA and motioned for Martin to follow him to the locker room. Netisingha arrived with the heroin and Martin gave him $4,000 cash for a package containing 50.65 grams of pure heroin.

On December 4, the agents asked Martin about buying a pound of heroin and flashed a $40,000 roll at him. Martin met with Creamer on the same day and discussed a per pound price. Martin then told the agents that $40,000 would buy 20 ounces of heroin. The next day Martin picked up a sample at Creamer's hot dog stand to show the agents. Later that day, Martin received a call at Bubba's Tavern from Creamer telling him that 18 ounces of heroin would be at the YMCA. Martin and the

undercover agents went to the YMCA and Creamer arrived shortly thereafter. Johnson exchanged $37,000 with Netisingha for the heroin in the locker room. Contemporaneously, Johnson observed Creamer in the locker room area.

Once outside the YMCA, Martin and Netisingha were arrested, with Creamer being taken into custody shortly thereafter at his hot dog stand. In a search incident to Creamer's arrest, the arresting officer found the paper Martin had previously given Creamer with the phone numbers for Bubba's Tavern and Martin's home. After being advised of his rights, Creamer stated, "I knew something was coming down," and in another conversation Creamer said, "I don't want to be a bother after what I have done," although he later denied making these statements.

With credibility determinations taken in favor of the Government, the evidence of the existence of a joint venture is overwhelming. Indeed, defendant concedes the evidence supports a conspiracy, claiming in his reply brief only that there was sufficient evidence to find Martin was on a fling of his own (R. Br. 7). We disagree that the evidence could support an independent contractor theory and, in any event, defendant's concession conclusively forecloses a substantial evidence attack. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

■ Nevertheless, defendant maintains it was error not to offer an instruction that if the jury found Martin to be an independent contractor, Creamer would have had to be acquitted. A criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the

charge against him and which has "some foundation in the evidence, 'even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'" *United States v. Hillsman*, 522 F.2d 454, 459 (7th Cir. 1975). But a jury instruction is only needed if the evidence raises a jury question. *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir. 1969). And in this context, if it cannot be said that a reasonable person "might conclude" the evidence supports a certain instruction, then the instruction need not go to the jury. Cf. *United States v. Feinberg*, 140 F.2d 592, 594 (2d Cir. 1944) (L. Hand, J.), certiorari denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562.

■ Defendant points to four widely separated pages of the transcript which reveal that although Creamer told Martin the price to the agents for the December 5 purchase would be $30,000, Martin in fact quoted a price of $37,000, intending to keep the extra $7,000 for himself. At best these transcript references show that Martin intended to cheat Creamer by skimming a part of the purchase price. But there is no testimony whatsoever to support the theory that Martin purchased the December 5 heroin from Creamer and then delivered it to the agents apart from Creamer's directions. Thus the instruction was properly refused. *United States v. Tritton*, 535 F.2d 359, 361 (7th Cir. 1976).[3]

### The Jury's Consideration of Equivocal Inculpatory Statements

■ Defendant also argues that the equivocal nature of the admissions he made after arrest do not warrant the admissions instruction given the jury,[4] claiming an un-

---

**3.** Moreover, the independent contractor theory was factually inconsistent with defendant's main theory of innocence and attack on Martin's credibility. This is apparent from the lack of cross-examination of Martin on the relationship between himself and Creamer concerning the heroin purchases and defense counsel's total failure to argue this theory to the jury.

**4.** The trial judge charged the jury as follows:
  "Evidence has been introduced that defendant allegedly made certain admissions relating to the crime charged in the indict-

ment. The jury must weigh such alleged admissions with caution, and scrutinize the circumstances surrounding them to determine whether they were made and, if so, were made freely and voluntarily. If the jury finds that such admissions were made freely and voluntarily by the defendant with knowledge of the nature of such admissions, and without fear or coercion, either physical or psychological, or promise of reward, the jury may consider them together with all the other evidence in determining the innocence or

due emphasis on a "miniscule" segment of the trial testimony. Whether the equivocal statements were incriminating was a jury question. *United States v. Jakalski*, 267 F.2d 609, 612 (7th Cir. 1959), certiorari denied, 362 U.S. 936, 80 S.Ct. 759, 4 L.Ed.2d 751. Since there is some evidence of an admission, the standard admission instruction was proper, and no special definition of "admissions" was required to supplement the jury's common sense. *United States v. Meyer*, 359 F.2d 837, 839 (7th Cir. 1966), certiorari denied, 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71. Moreover, the admission instruction was placed in proper perspective by the trial judge's quoted charge to the jury.

■ Still Creamer argues that, in effect, the jury was permitted to consider his assertion of his right to remain silent as substantive evidence of defendant's guilt which, if true, would run afoul of the Fifth Amendment. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. But defendant's argument has no support in the record. The jury only heard that the defendant was given *Miranda* warnings and that he made one arguably incriminating statement, followed shortly thereafter by a denial of the utterance and a general profession of innocence (Tr. 288–295). These statements do not amount to informing the jury of Creamer's decision to remain silent.

### The Prosecutor's Bolstering of Martin's Credibility

The central thrust of the defense was that Martin was not worthy of belief and

that the Government could not have made out even a *prima facie* case against Creamer on any count without him. From the facts recited above, it is clear that the extensive surveillance and the overwhelming circumstantial evidence could support the conviction without Martin's direct testimony. Creamer does not quarrel with the proposition that credibility determinations are for the jury.[5] Rather, he does argue that Martin's credibility was impermissibly bolstered by the Government.

■ In essence, defendant argues that government counsel vouched for Martin by asking Martin certain questions about his understanding of his plea agreement and by commenting in rebuttal argument on Martin's testifying. A prosecutor may neither inject his personal opinion on credibility into the proceedings, nor should the jury be led to believe that the prosecutor has other information not presented at trial which leads him to believe the witness is telling the truth. *Lawn v. United States*, 355 U.S. 339, 359–360 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321. But here there was no overt statement of personal belief and no insinuation that the prosecutor knew better than the jury what the truth was. Rather the exchanges were engaged in to establish the pressures under which Martin testified by putting Martin's understanding of his plea agreement, and what would happen if he breached his end of the bargain, before the jury. By calling a witness who testifies pursuant to an agreement requiring him to

guilt of the defendant. However, if the jury finds that the admissions were not made or, if made, were not made freely and voluntarily by the defendant, the jury should disregard them entirely." (Tr. 486)

5. Creamer's counsel's cross-examination provided ample material to impeach Martin:
"On cross-examination, Martin admitted he told the agents he had a nephew from whom he could get heroin. He also had narcotic transactions with Americo Scala, a partner of his in a furniture store. He also bought and sold marijuana, and offered to sell large quantities of amphetamines to the agents. Although he denied that he told the agents that if he was out of town his 22 year old son would handle his narcotic business, the

agents testified he did so tell them. He had another supplier of heroin, one Pat Brophy. He would lie to his probation officer and falsify probation reports. He was a three-time loser and was not going to the joint for anybody; and he would do anything to stay out of the penitentiary." (D Br. 5; record citations omitted).

Moreover, Creamer did have some legitimate transactions with Martin. Creamer bought a leather jacket from Martin at a flea market and Creamer took Martin to a candy wholesaler, both in the area where the narcotics transactions occurred. Nevertheless, the jury apparently decided that the thrust of Martin's testimony was credible.

testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness' veracity. *United States v. Isaacs*, 493 F.2d 1124, 1165 (7th Cir. 1974), certiorari denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146; *United States v. Aloi*, 511 F.2d 585, 598 (2d Cir. 1975), certiorari denied, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386.

■ Finally, Creamer argues that a misstatement of fact by the prosecutor in closing argument requires a new trial. In the trial's closing argument, the prosecutor stated that if defense counsel was so concerned about what happened between Martin and Creamer, counsel should have asked Martin on cross-examination what was said between Martin and Creamer at their meeting at the YMCA. In fact, there was no evidence of any conversation between Martin and Creamer at the YMCA. Upon objection the court stated that the jury would recall the evidence [6] (Tr. 469). Creamer cites two recent Seventh Circuit opinions which reversed convictions where the prosecutor went outside the record in his argument. But in both *United States v. Fearns*, 501 F.2d 486 (7th Cir. 1974), and *United States v. Davis*, 532 F.2d 22 (7th Cir. 1976), the prosecutor was attempting to rehabilitate a government witness on a crucial aspect of the Government's case by detailing prior consistent statements made to the Government which were not in evidence before the jury.

Here whether or not Creamer spoke to Martin at the YMCA was not crucial to the Government's case. Moreover, defendant's objection, itself a misstatement (see note 6 *supra*), had a neutralizing effect on the

jury. It must be remembered that "'[a]lmost every jury trial requires some compromise with standards of absolute perfection; such deviations must be tolerated if the jury system is to function effectively.'" *United States v. Jackson*, 542 F.2d 403, 410 (7th Cir. 1976). In light of the numerous meetings, contacts and conversations spread over the record between Creamer and Martin, the misstatement did not prejudice Creamer and was therefore harmless error.

For the reasons detailed above, the conviction of defendant Terrence Creamer is affirmed.

---

**6.** Creamer maintains that the court should have corrected the erroneous statement of the prosecutor. The Government fairly characterizes the context of the interchange as follows (Gov't Br. at 15 n. 24):

"The prosecutor misstated the evidence when he spoke of a conversation inside the 'Y.' Defense counsel objected, asserting Martin never testified he *saw or* talked to Creamer inside the 'Y.' The record however, reflects that Martin testified he met Creamer

in the 'Y' on the day of the second two ounce sale. (Tr. 109). Furthermore, Agent Johnson testified he saw Creamer near the locker room area at the time of the 18½ ounce sale. (Tr. 47). The prosecutor, in response to defense counsel's misstatement stated that there was testimony to support him."
To require the trial judge to resolve for the jury what the evidence actually was would have been more confusing than illuminating.