UNITED STATES of America, Appellee,

v.

Wilson ARROYO–ANGULO, Hugo Gomez, Jaime Rayo-Montano and Guillermo Moreno, Defendants-Appellants.

Nos. 587, 588, 640 and 691, Dockets 77–1390, 77–1396, 77–1397 and 77–1398.

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1978.

Decided June 30, 1978.

Constance Cushman, Asst. U. S. Atty., New York City (Robert F. Fiske, Jr., U. S. Atty., S. D. N. Y., Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Barry Bassis, New York City (Martin Erdmann, Legal Aid Society, New York City), for defendant-appellant Arroyo-Angulo.

Raphael H. Beauduy, New York City, for defendant-appellant Gomez.

Donald Nawi, New York City (David Blackstone, New York City), for defendant-appellant Rayo.

Ira Leitel, Brooklyn, N. Y., for defendant-appellant Moreno.

Before FRIENDLY, MULLIGAN and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by Wilson Arroyo-Angulo (Arroyo), Hugo Gomez, Jaime Rayo-Montano (Rayo) and Guillermo Moreno from judgments of conviction entered on July 21, 1977 in the United States District Court for the Southern District of New York, after a five-week trial before the Hon. Kevin T. Duffy, United States District Judge, and a jury. The indictment charged the four appellants and two others Jose Jeroncio Ahon-Casquete (Ahon) and "John Doe" [1] with federal narcotics law violations. Count one charged the appellants with conspiracy to violate the narcotics laws from December 20, 1975 until February 19, 1976. Count two charged each of the appellants with aiding and abetting the distribution of one kilogram of cocaine on February 19, 1976 in violation of 21 U.S.C. § 841(a)(1). The jury convicted each appellant on both counts and Judge Duffy sentenced them to the prison terms set forth in the margin.[2]

I

The Government's case rested primarily upon the trial testimony of Emilio Rivas, a co-conspirator, who testified that he had assisted the defendants in smuggling some 20 kilograms of cocaine estimated to be worth over $700,000 from a Gran Colombiana Line ship moored in San Francisco in January, 1976. He was arrested in Manhattan on February 19, 1976 for the sale of some of this cocaine. Rivas had pleaded guilty to one count of an indictment charging him with conspiracy to distribute and the distribution of cocaine and on July 13, 1976, the Hon. Henry F. Werker, United

---

1. The indictment against Ahon was dismissed at the close of the Government's case. "John Doe" has never been arrested.

2.

| | Count One | Count Two | |
|---|---|---|---|
| Guillermo Moreno: | 15 years | 15 years | Consecutive |
| Hugo Gomez: | 15 years | 15 years | Concurrent; consecutive to sentence of 15 years imposed in District of Oregon on July 8, 1977. |
| Wilson Arroyo: | 15 years | 15 years | Concurrent |
| Jaime Rayo: | 7 years | 7 years | Concurrent; concurrent with sentence of 15 years imposed in District of Oregon on Mar. 30, 1977. |

States District Judge, sentenced him as a second felony offender to 20 years' imprisonment to be followed by six years' special parole. Rivas then decided to cooperate with the Government and was not charged in the instant indictment. At the time of his testimony in this case his motion for a reduction of his sentence was pending before Judge Werker.

Rivas testified that he had been a seller of cocaine since 1970. Late in 1975 Rivas went to San Francisco to obtain cocaine which was smuggled in from a Gran Colombiana vessel. After he assisted in having the drugs flown back to Brooklyn, Rivas received $4,500 in cash and cocaine for his part in the transaction. While he was engaged in this scheme in San Francisco, Rivas was introduced to defendants, Moreno, Ahon, Rayo and Arroyo. Moreno later visited Rivas in Brooklyn and advised him that he, Moreno, could obtain "material" from ships coming into San Francisco harbor. At a second meeting at the Brooklyn home of Moreno's aunts Moreno again made the offer and discussed a trip by Rivas to San Francisco to join in the enterprise. Pursuant to arrangement Rivas, together with one of Moreno's aunts, flew to San Francisco in January, 1976. During his stay on the west coast Rivas resided in the same apartment house occupied by Moreno in Daly City, California. While waiting for the ship to arrive at San Francisco harbor, Rivas met and passed the time with the appellants Gomez, Rayo and Arroyo. With Arroyo and Rayo, Rivas also visited an apartment in San Francisco (the "house of the swimmers") which was frequented by those who pursued the sport of donning skin-divers' wetsuits and swimming out to ships moored in the harbor. There they retrieved packets of cocaine lowered into the water by members of the vessels' crews.

After a wait of two weeks, the ship Ciudad de Tunja arrived and was berthed at Pier 50 A in San Francisco.[3] Subsequent to a meeting among a Colombian sailor, Gomez, and Moreno, the latter announced that the arrangements to pick up the cocaine had been completed. Rivas drove the swimmers, Arroyo and Rayo, who wore wetsuits, to a small boat ramp in the area of Pier 50 where they entered the water. He returned later that night and picked them up. At that time Arroyo and Rayo were carrying a large, wet bundle which was loaded in the car before the three drove to Moreno's building. When the bundle had been carried into his apartment, Moreno emptied the bag into a bathtub and, with Gomez, counted out some 32 one-pound packets plus 5 larger packets containing from one kilo to three and one-half kilo quantities of cocaine. Gomez took the three largest packets saying: "These are ours." One of the packets was cut open and divided into smaller quantities so that Rivas could take some cocaine back to New York the next day. Moreno gave Rivas six eight-ounce packets and fixed the price at $1,000 per ounce, less $5,000 which was Rivas' fee for transporting the swimmers that night. Rivas further testified that the next day Moreno made a cocaine sale in his presence to a cash customer. The cash was given by Moreno to Gomez.[4] Rivas then flew to New York where after all this complicated maneuvering, he made the usual mistake of selling one kilogram of diluted cocaine to an undercover agent of the Drug Enforcement Administration (DEA). This sale led to the conviction we have recounted.

The Government also introduced evidence of subsequent similar acts by Arroyo, Rayo and Gomez in May, 1976 and October, 1976 while they were under the surveillance of agents of the DEA and the United States Customs Service. Both incidents, one in San Francisco and one in Portland, Oregon,

---

**3.** Part of Rivas' testimony was corroborated by documentary evidence, e. g., his flight ticket to San Francisco, certain toll telephone calls from Daly City, California to Rivas, the arrival of the vessel, the purchase of automobiles employed in the transaction, etc. Moreno at the time was also under surveillance by agents who testified at trial.

**4.** In light of this recitation of facts Gomez' argument that the evidence was insufficient to warrant his conviction is without merit.

involved the retrieval by swimmers of cocaine from Gran Colombiana Line vessels. In addition, according to the testimony of three federal agents, Arroyo, who had been a paid informant of the DEA, admitted in March, 1976 that on six or seven occasions he had acted as a swimmer, smuggling cocaine and marijuana from Gran Colombiana Line vessels in San Francisco and elsewhere.

## II

■ The principal argument raised on this appeal by Moreno and Arroyo is that during the course of the trial Judge Duffy conducted various *in camera* hearings at which not all the appellants and their counsel were present.[5] Moreover, the minutes of these proceedings were sealed and not made available to counsel. Appellants urge that these procedures deprived them of the right to be present at criminal proceedings against them in violation of their Sixth Amendment rights to a public trial, to the effective assistance of counsel and to confront the witnesses against them. This argument deserves close consideration since such *in camera* proceedings during a criminal trial are manifestly conceptually incompatible with our system of criminal jurisprudence. E. g., *United States v. Moten*, 582 F.2d 654, 660–661 (2d Cir. 1978) (*Moten II*); *In re Grand Jury Subpoena*

*Directing Taylor to Appeal and Testify*, 567 F.2d 1183, 1187–88 (2d Cir. 1977); *United States v. Clark*, 475 F.2d 240, 244–46 (2d Cir. 1973); *United States v. Bell*, 464 F.2d 667, 670 (2d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972); see, e. g., *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (defendant's right to a public trial); *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *United States v. Tortora*, 464 F.2d 1202, 1208–10 (2d Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972); *United States v. Dalli*, 424 F.2d 45, 48 (2d Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1960); F.R.Cr.P. 43; Anno., Accused's Right, Under Federal Constitution, to be Present at his Trial, 25 L.Ed.2d 931 (1970) (defendant's right to be present at criminal proceedings against him).

However, there is precedent for the proposition that "limited exceptions are constitutionally permissible." *United States v. Bell, supra*, at 670; see, e. g., *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *Roviaro v. United*

---

5. The *in camera* proceedings the minutes of which were sealed included the following: pretrial motions and conferences with each defendant which Judge Duffy held *seriatim* on May 17, 1977 (At that time Moreno moved to strike surplusage from the indictment and to dismiss the indictment on the ground that he had been misidentified therein. Gomez moved to dismiss the indictment for improper venue.); a May 20 hearing on a motion by Ahon to suppress testimony concerning his arrest on June 6, 1977 as well as post-arrest statements and admissions; a motion by Rayo on May 27 regarding the introduction against him of certain similar act evidence; a hearing held on June 8 concerning the introduction of certain admissions against Arroyo; a conference on June 16 at which counsel for Rayo and Gomez stipulated to certain points which had arisen on cross-examination of a DEA agent during the introduction of similar act evidence; several conferences during the course of the trial held between Judge Duffy and the Assistant United

States Attorney regarding the redaction of testimony and materials of which portions were to be turned over to the defendants under 18 U.S.C. § 3500. (These conferences are to be distinguished from the other *in camera* proceedings in that they are expressly authorized under 18 U.S.C. § 3500(c).) *United States v. Moten*, 564 F.2d 620, 630 (2d Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977) (*Moten I*); finally, on June 6 the hearing on Ahon's suppression motion was continued. Ahon's counsel was present throughout the hearing and all defendants' counsel were present during the latter portion of it. Several statements elicited during this hearing implicated co-defendants. However, since the similar act evidence against Ahon which arose out of this hearing was ruled inadmissible under Fed.R.Ev. 404, nothing pertaining to the subject matter of this hearing was ever introduced at trial, nor were the minutes of this proceeding sealed.

*States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Hence, our task is to determine whether the procedures adopted in the district court were constitutionally valid.

■ The constitutional rights of each defendant must of course be observed while he is standing trial with co-defendants. The Government, having seen fit to jointly indict and try multiple defendants cannot arbitrarily pick and choose those parts of the proceedings which it deems pertinent only to a particular defendant and exclude the others from participation therein. The decision of the trial judge to permit such closed sessions can only be justified by a compelling Government necessity for secrecy which must be weighed against the extent of the intrusion, if any, upon the interests of the excluded defendants, *Moten II, supra,* 582 F.2d at 661; *In re Grand Jury Subpoena Directing Taylor to Appear and Testify, supra,* 567 F.2d at 1188; *United States v. Ruiz-Estrella,* 481 F.2d 723 (2d Cir. 1973); *United States v. Clark, supra; United ed States v. Bell, supra; United States v. Lopez,* 328 F.Supp. 1077, 1086–92 (E.D.N.Y. 1971).

The record here discloses that the principal reason for closed sessions was that some of the defendants had cooperated with the Government on various occasions in an ongoing investigation into the smuggling of cocaine and other drugs from Colombian ships and the illicit distribution of those drugs throughout the United States. This investigation encompassed activities far broader than the crimes charged in this indictment. In the course of their cooperation with the Government some defendants made statements which provided information about activities not pertinent to the trial below and which the security of the investigation required be kept confidential. These statements, however, also implicated one or more co-defendants. The full extent of the inculpation of co-defendants and others was not made public, nor was it known to all participants in the trial. However, extensive cooperation was obviously suspected since the trial judge observed that death threats had been made to cooperating

witnesses. In fact, Rivas' family was placed in protective custody because of the overt cooperation of that witness. The defendants were each housed on separate floors and in separate quarters in the Metropolitan Correctional Center. Metal detectors were used to search those coming into the courtroom. The jury was provided with a special entrance to secure their privacy and protection. Prior to the beginning of the trial on May 18, 1977, Arroyo and Ahon engaged in a bloody brawl in the courthouse outside the presence of the jury. The fight resulted in visible bodily injury to Ahon when he entered the jury's presence. Consequently, it was necessary to impanel a new jury before the trial could proceed.

The judgment of the trial court that extreme security measures were warranted is corroborated by the fact that the defendants themselves requested those *in camera* proceedings which directly concerned them and most requested the sealing of the minutes of the proceedings as well. Arroyo, while moving with Moreno to unseal the minutes of these proceedings, is opposed to making public the record of his own *in camera* proceedings. In view of the above, in those proceedings where government agents were to testify to admissions made by certain defendants which implicated co-defendants or which revealed details of the investigation not pertinent to the trial of these defendants, there were compelling reasons for *in camera* proceedings in order to protect the lives of cooperating defendants and to secure the continuing drug smuggling investigation as well as future prosecutions.

■ In light of these circumstances we must now evaluate the appellants' contentions that the *in camera* proceedings violated their constitutional rights. With respect to the claim that their right to a public trial was violated, the threat of death or serious injury to certain defendants if the content of the proceedings was revealed, combined with the necessity to maintain the integrity of the ongoing drug investigation, amply justified the *in camera* procedures below. *See United States v. Bell, supra* and *United*

*States v. Lopez, supra* (approving limited closed hearings involving revelation of hijacker profile for safety of public). See also *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and *Estes v. Texas, supra* (limited public exclusion acceptable if necessary to protect defendant).

▮ Moreno also argues that his Sixth Amendment confrontation rights were invaded by the closed proceedings. While the intended scope of the confrontation clause has not been precisely defined, see *California v. Green*, 399 U.S. 149, 174, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring), its primary object is to bar the use of *ex parte* evidence of testimony against a defendant who was precluded from the opportunity to cross-examine the witnesses called against him at trial. Id. at 156–58, 90 S.Ct. 1930; *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The only closed proceedings which involved the potential for such a confrontation problem were those few instances where a defendant sought to suppress prior admissions to Government agents which also inculpated co-defendants. In each of those instances the defendant seeking suppression was present at the *in camera* proceeding with his counsel. Also, in those cases the trial judge during *in camera* conferences with the Assistant United States Attorney carefully redacted the testimony. Consequently, at trial no reference was made to any defendant other than the defendant who had been present at the hearing with his counsel when the testimony of the agent was initially elicited.[6] Moreover, the redacted testimony was admitted with limiting instructions that it be considered only against the named defendant in compliance with *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476

(1968) and *United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). Thus, our examination of the sealed minutes and the record discloses no exclusion of any defendant from any closed proceeding which developed testimony later utilized against him at trial. Hence, no defendant was precluded from confronting a witness who offered testimony against him.[7] We note that we have recently held that a trial judge did not abuse his discretion when he determined that co-defendants against whom testimony was not offered, could not even cross-examine a witness because he did not testify against them. *United States v. Rosenwasser*, 550 F.2d 806 (2d Cir.), cert. denied, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977). Clearly then, the holding of the *in camera* proceedings below did not violate the appellants' rights under the confrontation clause of the Sixth Amendment.

▮ In fact, the appellants who have raised these issues do not claim that any inculpatory material introduced at trial had its genesis in closed sessions from which they were barred. Rather, Moreno urges that had his counsel been present he would have learned more about the Government's case. He argues that as a result defense counsel might have discovered exculpatory material or "leads" which would have been helpful in his defense. Thus, Moreno claims that he was denied the effective assistance of counsel.

We recognize that the defendant in a criminal proceeding is entitled to the assistance of trial and appellate counsel and that the presence of the trial judge at the *in camera* proceedings and the examination of the minutes by an appellate court do not assure a defendant of the assistance of the advocate to which he is normally entitled. This is precisely why the *in camera* proce-

---

6. See note 5, *supra*.

7. In support of their attack on the *in camera* proceedings Moreno and Arroyo rely heavily on several cases, *In re Grand Jury Subpoena Directing Taylor to Appear and Testify, supra; United States v. Clark, supra; Evans v. United States*, 284 F.2d 393 (6th Cir. 1960), which are distinguishable from the instant case in a sig-

nificant respect. In each of those cases the defendants were excluded from proceedings relating directly to evidence to be offered against them. As we observe in the text, the defendants excluded from the *in camera* sessions in this instance did not have the same direct interest in the subject matter of those proceedings.

dures employed below can only be justified by the Government's demonstration of a compelling necessity. See *Dennis v. United States, supra,* 384 U.S. at 874–75, 86 S.Ct. 1840. But in any event we cannot accept Moreno's argument on this point. To the extent the *in camera* proceedings produced exculpatory material, the Government was duty-bound to provide such material to the defendants under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) regardless of whether the information was elicited *in camera.* Our examination of the sealed minutes, however, leads us to the conclusion that the minutes contain nothing which was possibly exculpatory. Moreover, as discussed above, that material which was inculpatory of defendants who had been precluded from attending *in camera* proceedings was excised before it reached the jury. Nor are we persuaded by Moreno's assertion that he might have perceived possible defense "leads" in the sealed material. A criminal defendant is not entitled to know everything that a Government investigation—particularly one this far-reaching—has unearthed when such information is not used against him at trial. See *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir. 1974); *United States v. Salazar,* 485 F.2d 1272, 1277–78 (2d Cir. 1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). Indeed, if Moreno had been granted the severance he unsuccessfully sought, he would not have had a right to any greater access to the closed proceedings than he had at the joint trial. We therefore conclude that the sealing of the minutes of the *in camera* proceedings below did not deprive appellants of the right to effective assistance of counsel.[8]

■ Arroyo claims that his motion for severance should have been granted on the theory that had he been tried alone there would have been no need to redact the *in camera* proceedings in which he participated and he would have been able to establish to the jury that he not only lied about his own participation but about that of his co-defendants as well. It is apparent that the crimes charged in the indictment arose out of the same acts and were established by substantially the same evidence, so that in the interest of judicial economy, all the defendants should have been tried together absent substantial prejudice. *United States v. Corr,* 543 F.2d 1042, 1052 (2d Cir. 1976). Arroyo has utterly failed to demonstrate this prejudice. Whether he would have testified at a separate trial is extremely speculative. If he had so testified, how his demonstration of his own incredibility would have impressed the jury with his innocence of the crimes charged is, at best, highly questionable. Arroyo's argument is particularly unpersuasive since his participation in this crime as well as the subsequent similar swimming venture was well corroborated by the testimony of Rivas, by surveillance by Government agents, and by other documentary evidence. We therefore simply cannot accept that Arroyo's counsel would have taken the approach which he describes on appeal even if he had been given the opportunity to do so. Thus, Judge Duffy did not, in our view, abuse his discretion by denying Arroyo's motion for severance. *Moten I, supra; United States v. Di Giovanni,* 544 F.2d 642 (2d Cir. 1976).

■ In sum, we conclude that the *in camera* proceedings here were justified by

8. Also unconvincing is Moreno's corollary claim that his counsel's exclusion from the closed proceedings prevented his attorney from minimizing the "spillover" effect on his client of the admission of similar act evidence concerning, and admissions by, his co-defendants. As discussed above, prior to its introduction this evidence was extensively redacted to eliminate any reference to certain defendants, including Moreno. The evidence was then received, with clear limiting instructions by the trial judge, against only specific named defendants. The manner in which Arroyo's admissions would be presented, in order to avoid *Bruton* problems, was discussed among the court and all counsel. Finally, extensive 3500 material relating to this evidence was turned over to the defense attorneys. Bearing in mind, of course, the compelling necessity for the closed proceedings in this case, we are satisfied that these steps were adequate to protect Moreno from "spillover" when the evidence was introduced against his co-defendants.

the threats of violence which pervaded the trial and by the need to keep confidential the broad drug smuggling investigation. The impingement on the interests of defendants precluded from attending the *in camera* proceedings, upon analysis, was minimal at best. We do not intend to indicate in any way that this case stands for the proposition that such closed proceedings are to be encouraged. On the contrary, they are fraught with the potential of abuse and, absent compelling necessity, must be avoided. We simply hold after a careful examination of the record in this case that under all the circumstances present here the procedures followed were not constitutionally infirm.

## III

The appellant Rayo argues that the Government improperly utilized the cooperation agreement between Rivas and the United States. At the trial the United States Attorney discussed the nature of the agreement in her opening statement to the jury, introduced a redacted version of it during the direct examination of Rivas and made references to it in her summation. The agreement, which is set forth in the margin,[9] was properly redacted to eliminate any reference to the fact that Rivas' family had been placed in protective custody. At trial its admission was objected to on the theory that it was self-serving and unfairly emphasized that its terms required Rivas to provide "complete, truthful and accurate information". On appeal Rayo has broadened his attack. He contends that the prosecutor's repeated references to the agreement constituted an improper vouching by the Government for the credibility of its own witness.

**9.** The redacted agreement provided as follows:

The understandings are that Mr. Rivas shall truthfully disclose all information with respect to the activities of himself and others concerning all matters about which this office inquires of him, and, further, shall truthfully testify at any trial or other court or Grand Jury proceeding with respect to any matters about which this office may request his testimony.

It is further understood that Mr. Rivas must at all times give complete, truthful and accurate information and testimony and must not commit any further crime whatsoever. Should Mr. Rivas commit any further crimes or should it be judged by this office that he has given false, incomplete or misleading testimony or information, or has otherwise violated any provision of this agreement, this agreement shall be null and void and Mr. Rivas shall thereafter be subject to prosecution for any federal criminal violation of which this office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecutions may be premised upon any information provided by Mr. Rivas, and such information may be used against him.

If Mr. Rivas provides complete and truthful cooperation, he shall not be prosecuted by the Federal Government or New York State authorities for charges based on information he has supplied to this office.

Mr. Rivas has received a sentence of twenty years and six years special parole, imposed by the Honorable Henry F. Werker on July 13, 1976, after his plea of guilty to Count 2 of Indictment 76 Cr. 212, which charged him with distribution and possession with intent to distribute one kilogram of cocaine. There is pending before Judge Werker a timely motion to reduce sentence pursuant to Rule 35, Fed.R. Crim.P. It is understood that the disposition of that motion is within the sole discretion of the sentencing Judge. This office cannot and does not make any promise or representation as to what sentence Mr. Rivas will ultimately receive, nor will it recommend any specific sentence to the sentencing Judge. However, this office will prepare and submit to the sentencing Judge a memorandum in which it will set forth (1) the terms of this agreement; (2) the full nature and extent of Mr. Rivas' cooperation with this office and the date when such cooperation commenced; and (3) all other information in its possession relevant to sentence.

It is further understood that, except as earlier stated in this agreement, the United States Attorney's Office for the Southern District of New York, cannot bind other federal, state or local prosecuting authorities, although this office will bring the cooperation of Mr. Rivas to the attention of other prosecuting offices, if requested.

It is further understood that, if requested, this office will bring the cooperation of Mr. Rivas to the attention of Federal Parole Authorities at the appropriate time, but such information will be transmitted without any recommendation as to what action the parole authorities should take. Also, this office will bring the cooperation of Mr. Rivas to the attention of the Immigration and Naturalization Service at the appropriate time.

No additional promises, agreements and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

The revelation to a jury of the terms of a cooperation agreement is an issue which has previously been considered by this court and we have repeatedly upheld the admission of such evidence against similar attack. *United States v. Ricco*, 549 F.2d 264, 274 (2d Cir.), cert. denied, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Araujo*, 539 F.2d 287, 290 (2d Cir.), cert. denied, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976); *United States v. Aloi*, 511 F.2d 585, 597–98 (2d Cir.), cert. denied, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. Koss*, 506 F.2d 1103, 1112–13 (2d Cir. 1974), cert. denied, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1976).[10]

 In these cases the Government apparently introduced the cooperation agreement on its redirect examination of a witness whose credibility had been ravaged on cross-examination by defense counsel. Here the Government anticipated the attack and introduced the agreement on direct examination. Although this distinction has not been squarely raised by the appellants on appeal and was not raised at trial, the timing of the admission here patently runs afoul of the well established rules of evidence that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible. E. g., McCormick on Evidence, § 49 at 102 (2d ed. 1972); 3 Weinstein's Evidence ¶ 607[08].

We find, however, no reversible error here in admission of the agreement on direct examination. The timing of the introduction of the agreement was not articulated as a basis of objection at the trial level as we have indicated. But we also note that in the opening to the jury the United States Attorney candidly admitted that the testimony of its star witness had to be "scrutinized with the greatest care." Rivas was described as an accomplice of the defendants in this crime and as a seller of cocaine and marijuana who broke the law

regularly. The Assistant United States Attorney then proceeded to inform the jury that Rivas had been convicted of a crime to which he had pleaded guilty; that he had been sentenced to 20 years' imprisonment and that there was a motion pending before the sentencing judge to reduce that sentence. The Government went on to advise the jury that under his agreement with the United States, if Rivas testified truthfully, his cooperation would be made known to that judge; if he did not tell the truth he would be prosecuted for perjury and his lack of cooperation would be communicated to the sentencing judge. Although defense counsel interrupted the Government's opening on three occasions to object to other issues, no objection appears on the record to these allusions to the cooperation～agreement.

The failure of counsel to object to the Government's reference to the agreement it had made with Rivas for his cooperation is quite understandable. The existence of the agreement here created a double-edged sword and it is debatable which edge cut more deeply. Defense counsel in their openings were quick to wield the weapon unsheathed by the Government.

Counsel for Moreno commented:

We are told that the government has told him [Rivas] that if he doesn't tell the truth he will be charged with perjury. But if he does tell the truth, apparently the truth that the government alleges and wants you to accept, they will recommend to a Judge that his sentence be reduced. Upon apparently this man's testimony, the fate of Guillermo Moreno and these other gentlemen rests. . .

. . . . .

Every witness as you know and can see is given an oath to tell the truth. Unfortunately, as we all know, it is all too easy for people to violate that oath.

---

**10.** Other circuits have reached the same result. *United States v. Creamer*, 555 F.2d 612, 617–18 (7th Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977); *United States v.* *Isaacs*, 493 F.2d 1124, 1165 (7th Cir. 1974); *United States v. Rosson*, 441 F.2d 242, 244 (5th Cir.), cert. denied, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971).

Transcript at 41, 42. Counsel for Ahon emphasized even more forcefully Rivas' motives to testify:

> Put yourself in the position of Mr. Rivas. Put yourself in the position of a man who is facing 20 years in jail, a man who looks forward to years and years and years locked up in a cell, rather than doing what he would want to do. . . . Ladies and gentlemen of the jury, I ask you, and you ask yourself, what would you do to avoid 20 years in jail.

Transcript at 53.

The record thus reveals that throughout the opening and without objection by defense counsel, the attention of the jury was focused on the credibility of the Government's star witness, Rivas, and on the most important factors affecting his credibility— his cooperation agreement and the importance to him of the determination of his pending motion for reduction of sentence. The obvious motivation of Rivas to lie in order to save his own neck was not only brought to the attention of the jury in the opening of the defense but was properly and vigorously pressed by defense counsel on cross-examination.[11] In summation as well, defense counsel argued strenuously that it was clearly to Rivas' advantage to help the Government convict the defendants. In view of the inevitability of defense counsels' attack on Rivas' credibility and the formidable assault which in fact was made in the defense openings, cross-examinations and summations, the error in the timing of the introduction of the cooperation agreement does not require reversal in this case.

■ Furthermore, we find no error in the Government's summation references to Rivas' cooperation agreement. Initially we note that no objection was made by any party to the Assistant United States Attorney's summation argument on this issue. Moreover, the cooperation agreement was a matter which the jury could properly consider in relation to the witness' credibility. Indeed, we have held:

> Remarks by the Assistant United States Attorney [on summation] to the effect that the government accomplice witnesses would be subject to indictment for perjury and other previously uncharged offenses in the event they testified falsely were amply supported by testimony already before the jury and did not prejudice the appellants. These comments did not amount to the government's improper vouching for its accomplice witnesses but simply constituted permissible argument to the effect that these witnesses, whose veracity and credibility had been fiercely attacked by defense counsel, had no motive to testify falsely,

*United States v. Ricco, supra* at 274; accord, *United States v. Araujo, supra; United States v. Aloi, supra; United States v. Isaacs,* 493 F.2d 1124, 1165 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); see *United States v. Creamer,* 555 F.2d 612, 617–18 (7th Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977).

## IV

■ Arroyo further claims that testimony of his admissions made to DEA agents in November, 1975 and March, 1976 should have been excluded under F.R.Cr.P. 11(e)(6) and Fed.R.Ev. 410 as "statements made in connection with" an offer to plead guilty.[12]

11. On cross-examination Rivas admitted that when he initially agreed to cooperate with the Government he falsely identified a fictitious character, "Charlie", as the source of his supply. This fabrication was only acknowledged by Rivas to the Government after he had been sentenced and agreed again to truthfully cooperate. On cross-examination Rivas further admitted that he was subject to an order of deportation; that he was facing charges of parole violation in the Eastern District of New York; that he had lied to Judge Werker on the occa-

sion of his guilty plea; that he had lied to his probation officer, his attorney, and the Assistant United States Attorney in order to help himself; that he lied on his application for readmission to the United States; that he was a regular distributor of drugs and that he stole from his employer.

12. F.R.Cr.P. 11(e)(6) provides:

Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an

Arroyo was arrested in Los Angeles on October 24, 1975 as a stowaway. Seeking to avoid deportation, he claimed to have information concerning cocaine smuggling through the use of Colombian vessels. Thereafter, Arroyo cooperated with DEA investigators on several occasions until he broke contact with his control agent. He was again arrested in March, 1976 and resumed cooperation in order to avoid deportation. Redacted versions of the admissions Arroyo made to DEA agents during these periods of cooperation were admitted at the trial. He was again arrested in May, 1976 in San Francisco while transporting divers in wetsuits. His subsequent confession that this was an attempted cocaine smuggling venture was not utilized at trial since one of the divers was a co-defendant. As a result of this arrest, however, Arroyo was deported and his cooperating individual status was terminated. Later he was arrested when he once again reentered the country illegally. Arroyo was awaiting deportation when he was brought to New York to stand trial for the charges in this indictment. When Arroyo made the admissions used against him at trial he had not been charged with a crime to which he had offered to plead guilty in exchange for information.

The purpose of F.R.Cr.P. 11(e)(6) is to encourage frank discussion in plea bargaining negotiations, e. g., *United States v. Herman*, 544 F.2d 791, 796 (5th Cir. 1977); 2 Weinstein's Evidence ¶ 410[01], since plea agreements are essential to the disposition of the bulk of cases in our criminal system. *Santabello v. New York*, 404 U.S. 257, 260–61, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The primary concern of the rule is the fairly formal plea bargaining between the defendant's counsel and the United States Attorney after charges have been made or are about to be made. *United States v. Stirling*, 571 F.2d 708, 731 (2d Cir. 1978); see Advisory Committee Note to F.R.Cr.P. 11(e)(6), reprinted in 62 F.R.D. 277 (1974). In *Stirling* the defendant, who was about to be indicted, entered into a plea bargain with the United States. He agreed to plead guilty to one count of the indictment in return for certain testimony before the Grand Jury and at trial. Id. at 730 n. 16. After testifying before the Grand Jury and after his indictment, the defendant declined to cooperate, pleaded not guilty and chose to stand trial. His Grand Jury testimony was admitted in evidence against him. On appeal, this court upheld admission of the Grand Jury testimony. In finding no violation of F.R.Cr.P. 11(e)(6), the court observed that to extend the protection of the rule to Grand Jury testimony given after entry into a formal plea agreement from which the defendant later withdrew would strain the plain language and purpose of the rule and would encourage manipulative abuse of criminal investigative processes. Id. at 731–32.

Similarly, in the instant case we find no basis to support Arroyo's claim either in the language or the policy of F.R.Cr.P. 11(e)(6). As noted above, no criminal charges had been lodged against Arroyo at the time of his admissions; nor were any such charges imminent. Arroyo made these admissions not as part of an arrangement including an offer to plead guilty but simply in order to stave off his deportation. We see no justification for extending the protections of rule 11(e)(6) to admissions made in such circumstances. See *United States v. Stirling, supra*, at 731–32. Moreover, Arroyo violated his agreement to cooperate, failed to maintain communication with DEA agents, and returned to his criminal activi-

offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel. Fed.R.Ev. 410 contains an identical provision from which F.R.Cr.P. 11(e)(6) was derived. See Advisory Committee Note to F.R.Cr.P. 11(e)(6), reprinted in 62 F.R.D. 277, 286 (1974); 8 Moore's Federal Practice ¶ 11.08.

ty. In view of Arroyo's blatant breach of the cooperation arrangement with the Government, to prohibit the introduction of his admissions would make a mockery of the investigative processes employed to secure evidence of serious crimes. Id.

[■■■] The arguments of Gomez and Rayo that evidence of their participation in the smuggling of 17 pounds of cocaine from a Gran Colombiana ship in Portland, Oregon in October, 1976 should not have been admitted against them is meritless. It is well established that evidence of other crimes, if relevant, is admissible against a defendant except when offered solely to prove criminal character or disposition. E. g., *United States v. Benedetto*, 571 F.2d 1246, 1248 (2d Cir. 1978); *United States v. Papadakis*, 510 F.2d 287, 294–95 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). One purpose for which such similar acts may be introduced is to prove knowledge, intent, identity, and plan or design. Fed.R.Ev. 404(b); *United States v. Miller*, 478 F.2d 1315, 1318 (2d Cir.), cert. denied, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973). The proof is admissible even if the acts occurred after the crime charged in the indictment. *United States v. Cavallaro*, 553 F.2d 300 (2d Cir. 1977); *United States v. Rosenwasser, supra; United States v. Grady*, 544 F.2d 598 (2d Cir. 1976). The events in Portland, which occurred some nine months after the crimes charged in this indictment, certainly were not remote in time from the crimes charged here. See *United States v. Chestnut*, 533 F.2d 40, 49–50 (2d Cir.), cert. denied, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). Moreover, the similarities between the crimes charged is striking. The evidence was therefore clearly relevant to establish both intent and a common scheme or design and its admission below was properly within the discretion of the trial judge.

The contention that evidence of the Portland similar acts should not have been admitted because the involvement of Rayo and Gomez in the Portland crime was not demonstrated is frivolous. The argument ignores the fact that Rayo had pleaded guilty to, and Gomez had been convicted of, crimes arising out of the Portland incident.

We have reviewed the other arguments raised on this appeal and find them to be without merit. The judgments of conviction are therefore affirmed.

FRIENDLY, Circuit Judge, concurring:

Although I agree that these convictions should be affirmed for the reasons stated in Judge Mulligan's thorough opinion, I cannot approve of the use made of the cooperation agreement in the summation of the Assistant United States Attorney. This included such remarks as the following:

> That's what motivates Mr. Rivas in this trial to tell you the truth, not respect for the oath of office or for the oath that he took.

$$* \quad * \quad * \quad * \quad * \quad *$$

> Now, he's motivated to tell the truth precisely to help himself. If he lies there is no agreement, there is no reduction of sentence. He's prosecuted, he's prosecuted for the crimes that he's admitted, for that swim, that pickup in October of 1975 with Cambindo.

$$* \quad * \quad * \quad * \quad * \quad *$$

> He finally has a motive to tell the truth because he has no choice. The government has its foot on his throat. He is in jail for 20 years and he will be 60 years old before he gets out of jail unless he is doing something about it.

$$* \quad * \quad * \quad * \quad * \quad *$$

> Do you think Judge Werker, the judge who sentenced him for 20 years while he was still saying, "Well, I was a delivery boy," do you think Judge Werker is going to look kindly on a man who says, "I wasn't a delivery boy. I bought a kilo, sometimes two every six or eight weeks and I sold it as fast as I could get my hands on it."

> If he lies, if the government doesn't write a memorandum for him do you think Judge Werker is going to look kindly on his motion to reduce sentence?

**1150**

Such remarks are prosecutorial overkill. They inevitably give jurors the impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the latter is not stretching the facts—something the prosecutor usually is quite unable to do; that any significant exaggeration by the witness of what the prosecutor believes to be the truth will cause the latter to refrain from writing the promised memorandum recommending leniency; and, perhaps worst of all, that an acquittal may involve serious consequences to the witness by releasing the Government from its promise or even by causing an indictment for perjury. None of our cases supports a summation with respect to a cooperation agreement like that made here. *United States v. Ricco,* 549 F.2d 264, 274 (2 Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977), comes the closest to doing so, but examination of the record reveals that the prosecutor's use of the cooperation agreement was nowhere near so extensive and offensive as here. (*Ricco* transcript, 1864–65). If proper objection had been made to the summation, the judge should have sustained it; if matters had gone too far to make a striking of the remarks an effective cure, the judge should have instructed that the promise in the cooperation agreement adds little to the truth-telling obligation imposed by the oath; that the prosecutor often has no way of knowing whether the witness is telling the truth or not; that the books are not filled with perjury indictments of Government witnesses who have gone beyond the facts; and that an acquittal would not mean that as a matter of course the Government would seek such an indictment or even fail to make its promised recommendation of leniency. If prosecutors know that such instructions will be given, they will hardly be tempted to the excesses committed here.